**In re Max TRIPPLET, Debtor.**

**Bankruptcy No. 87–52640–11.**

United States Bankruptcy Court,
W.D. Texas,
San Antonio Division.

Jan. 11, 1988.

William R. Davis, Jr., San Antonio, Tex., for Max Tripplet.

Diann M. Bartek, San Antonio, Tex., for Principal Mut.

## MEMORANDUM OPINION

R. GLEN AYERS, Jr., Chief Judge.

Once again, this Court must attempt to determine the effect of an assignment of

rents clause in a deed of trust coupled with a collateral document assigning rents upon stated events of default. The dispute arises in the context of a rather ordinary Chapter 11 case involving rental property. Max Triplett (hereinafter "Debtor"), borrowed large sums from the creditor, Principal Mutual Life Insurance Company (hereinafter "Creditor"). The debt is secured by real property which produces an income stream. The security interest is properly perfected by a Deed of Trust and a "Collateral Assignment of Lease and Rents." The Deed of Trust contains a clause allowing the creditor to collect rents on default. The "Collateral Assignment" is a separate document, purporting to assign all rents as of the inception of the lending transactions. However, the Debtor, under the terms of the "Collateral Assignment," was granted a license to collect rents until default.

Prior to the petition in bankruptcy, default was declared, the license to collect rents was revoked, the creditor demanded that the tenants pay the rents over to it, and the creditor actually collected some rents. Now, the Debtor seeks to use the rents as "cash collateral" under 11 U.S.C. § 363. The Creditor's response is simple; it claims to *own* the leases and rents and alleges that the rents are no longer collateral.

## FINDINGS OF FACT

The facts, as should be evident from the introduction, are not in dispute. The notes, deed of trust, and "Collateral Assignment" are stipulated to be valid. Demand was made on the Debtor on August 27, 1987; the notes were accelerated on September 25, 1987. Thereafter, demand was made directly on the tenants by the creditor. The parties stipulate that the assignment was valid and that the license was revoked.

## CONCLUSIONS OF LAW

There are essentially two ways to approach this issue. One is by analogy to Article 9 and has the advantage of sim-

plicity and predictability. To do so would ignore the language of the agreements (contracts) between the parties. The second is to attempt to deal with the *actual* contractual language of the documents and apply the existent cases to that language.

### A. The Article 9 Analogy

■ To set the stage, it is necessary to return briefly to the documents and see what the documents purport to do. The documents create, in the deed of trust, a security interest or lien in both realty and rents derived from realty. However, because Texas is a "lien theory" state, a mortgagee has no right to collect rents until foreclosure. *See Taylor v. Brennan*, 621 S.W.2d 592, 594 (Tex.1981). Pending foreclosure, rents may be garnished (from tenants) or subjected to other equitable proceedings such as a receivership.[1] *See Betzen v. Exxon Corp.*, 699 S.W.2d 352, 354–55 (Tex.App.—El Paso 1985).

However, the documents in this case purport to transfer an increment of ownership in leases and rents to the Creditor. The "Collateral Assignment," on its face, states that, as of the inception of the lending transaction, the leases and rents have been alienated by the mortgagor and that the Creditor "owned" those assets from the inception of the lending relationship. Pending default, the debtor/mortgagor collected the rents under a license granted by the "Collateral Assignment." In similar cases, some courts have given effect to the language and found a "sale" or "transfer" of ownership, rather than a pledge of rents as collateral. *See e.g., Kinnison v. Guaranty Liquidating Corp.*, 18 Cal.2d 256, 115 P.2d 450, 453–54 (1941).

Other courts have refused to find anything other than a form of pledge of collateral. *See* cases cited at *id.*, 115 P.2d 453. The analogy to Article 9 is apparent. Section 9–102(1)(a) reads as follows:

(1) Except as otherwise provided ..., this Article applies

---

**1.** The creditor, Principal Mutual, was seeking appointment of a receiver when the Debtor filed bankruptcy.

(a) to any transaction (regardless of form) which is intended to create a security interest in personal property or fixtures ...

By ignoring the language of the contracts between the Debtor and Creditor, it is clearly possible to argue that the legal intent of the transaction reflected by the deed of trust and "Collateral Assignment" was to make rents collateral for the debt and to create a mechanism allowing the creditor to collect rents pending foreclosure without resort to equity.

Thus, irrespective of the actual verbage of the contract between the parties to the agreements concerning assignment, license, etc., all that is present is a security interest in rents. The rents remain collateral, and 11 U.S.C. § 363 would allow use of cash collateral if the statutory requirement of "adequate protection" could be shown.

This approach has advantages. First, it is simple and predictable. Rents are always treated as collateral (or almost always collateral, unless extremely persuasive facts are present).[2]

Further, it makes reorganization more likely, for to give effect to the agreements makes reorganization impossible. As my opinion in *In re Fry Road Assoc's Ltd.*, 66 B.R. 602, 604-05 (Bankr.W.D.Tex.1986) stresses, without the income stream, most real property reorganizations must fail. If the documents are given effect in this case, the rents have been finally and irrevocably alienated. Unless the Debtor can find operating expenses from some other source (including new or replacement leases, one supposes), there is no fund for use by the

Debtor.[3] Bankruptcy policy, then, would encourage use of the Article 9 analogy.

However, the Article 9 analogy is lacking in several respects. Section 9–102, as quoted above, is a statement of public policy by the legislature. Where security interests in personalty are concerned, the legislature has created a single mechanism for perfection of security interests as a matter of policy. This is a proper and arguably exclusive legislative function. It is not necessarily a proper judicial function. Therefore, the Article 9 analogy suffers from the weakness of being judge-made law. Such judge-made law violates the fundamental tenets of *Butner v. United States*, 440 U.S. 48, 54–55, 99 S.Ct. 914, 917–18, 59 L.Ed.2d 136 (1979):

> "Congress has left the determination of property rights in the assets of a bankruptcy's estate to state law.
>
> Property interests are created and defined by state law. Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding."

The arguments expressed above—simplicity, predictability, and an increased likelihood of reorganization—are not sufficient to take this case out of *Butner*[4] and allow this Court to disregard to the intent of the parties as reflected in the documents.

### B. Analysis of the Contracts and in Particular the "Collateral Assignment."

■ There are two documents purporting to create rights in the rents. The first, the Deed of Trust, clearly and merely cre-

---

**2.** I have previously found an absolute assignment where the documents purported to create an absolute transfer; the debtor consented, pre-petition, to rent collection by the creditor; and, post-petition, the debtor consented to rent collection by the creditor as one condition of a post-petition. This opinion must be read in the light of the peculiar facts of the case. Estoppel and other equitable arguments form the underlying basis of the opinion. *In re Fry Road Assoc's., Ltd.*, 64 B.R. 808 (Bankr.W.D.Tex.1986). *See also In re Fry Road Assoc's., Ltd.*, 66 B.R. 602 (Bankr.W.D.Tex.1986) (on motion for relief from stay).

**3.** *Fry Road* involved a single asset; this case involves multiple assets. This language is mere dicta as to this case. It is only a policy argument.

**4.** Purely by happenstance, *Butner* deals with almost the same issues as the one before this court; whether a mortgage (above) creates an interest in rents. *See Butner*, 440 U.S. at 52, 99 S.Ct. at 916.

ates a security interest in the leases. *See Taylor v. Brennan,* 621 S.W.2d at 594. The second is more difficult, for, as I have stated above, it purports to transfer title to rents to the creditor, then to grant a license for collection and use back to the Debtor, with the license subject to revocation.

The case law concerning documents like the "Collateral Assignment" used in this case are not rare. While results concerning validity or effect may vary, the cases uniformly hold that the document must be interpreted by reference to state law. *See e.g., In re Gould,* 78 B.R. 590, 591 (D.Idaho 1987); *Provident Mut. Life Ins. Co. v. Winslow Center Assoc's (In re Winslow Center Assoc's),* 50 B.R. 679, 681 (Bankr.E. D.Pa.1985); and *Santa Fe Fed. Sav. & Loan Assoc. V. Oak Glen R–Vee (In re Oak Glen R–Vee),* 8 B.R. 213, 216 and 216 at n. 3 (Bankr.C.D.Cal.1981).

Under the *Butner* doctrine, state law must be reviewed to determine the rights of creditors unless there is some supervening federal interest. As discussed above, no such interest exists in this case. Texas law concerning this issue is confined almost exclusively to *Taylor v. Brennan, supra. Taylor* recognizes the existence of absolute assignment of rents if such was the intent of the parties "ascertained by construing the instruments...." 621 S.W. 2d at 594 (citations omitted).

In *Taylor,* the assignment was held to be a pledge and not an absolute transfer because the assignment was given "further to secure the payment" of the note. *Id.* (quoting the instrument). If the court had found an absolute transfer, title to the rents would have passed and not a security interest. *Id.* The documentary reference to a security interest was sufficient to defeat that concept.

In this case, I also must find an intent to pledge and perfect and not an absolute transfer. Here, the "Collateral Assignment" also "transfers" the rents and leases "as security for the payment of the....

loan...." The document also allows the creditor to collect and apply rents to the debt after default. It does not require liquidation of the collateral and reduction of the debt.[5] Finally, the assignment terminates upon payment of the debt "secured hereby."

A creditor is either a creditor with a security interest in collateral or an owner of the collateral following foreclosure with a deficiency claim for any balance unpaid following foreclosure. A discharge of the debt *pro tanto* or liquidation of the assets is required for a finding of an absolute assignment. To construe these documents and facts as liquidating a portion of the collateral—prior to or after default—is nonsense. Put simply, there has been no *pro tanto* discharge of the debt as is required under an absolute assignment. *See Id.* at 594; *In re Fry Road Assoc's Ltd.,* 64 B.R. at 810 n. 1.

This analysis is not merely consistent with the documents and with state law; it is also consistent with the historical development of documents like the ones before me. In order to understand these documents, it is necessary to briefly return to the introductory discussion concerning the rights of mortgagees as to rents. Absent foreclosure or a proceeding in equity, a mortgagee in Texas has no right to rents. *See Taylor,* 621 S.W.2d at 593–94. That is to say, default under the Deed of Trust creates no rights to rents absent either foreclosure or a proceeding in equity. In the period between default and such a remedy, the debtor can use rents or a third party might garnish or attach rents. To prevent this inequity, the assignment device came into being. For a brief history of these devices, *see 3 Powell on Real Property* ¶ 454.1[3][a] (1987) *See also* Note, "Effect of Assignment of Income Clause in Trust Indenture and Supplemental Contract Concerning Rents and Profits," 47 Yale L.J. 1000 (1938); and 1 *Jones On*

---

5. It might be possible to contractually provide for liquidation of the present value of rents with a clause similar to a liquidated damages clause. If the rents were liquidated following seizure and the balance of the debt reduced, it would seem that the rents would then no longer be collateral.

*Mortgages* § 171 (11th ed. 1904).[6]

## C. Effect of Such Agreements.

■ While I have declined to find an absolute assignment of rents, the "Collateral Assignment" is not without effect. As to any rents due after the date of revocation of the license, I find that the creditor/mortgagee is, in effect, a secured creditor. That is, the document obviates the need for an equitable remedy such as a receivership prior to foreclosure as would be required under a simple deed of trust with a rent collateralization clause. *See Taylor*, 621 S.W.2d at 594. *See also In re Casbeer*, 793 F.2d 1436, 1442 (5th Cir.1986).

Sending the notice of default and termination of the collection license satisfied the question of perfection enunciated by the Fifth Circuit in two recent cases, *In re Village Properties, Ltd.*, 723 F.2d 441 (5th Cir.1984), cert. den., 466 U.S. 974, 104 S.Ct. 2350, 80 L.Ed.2d 823 (1984) and, more recently, at *In re Casbeer*, 793 F.2d 1436 (5th Cir.1986).

To recognize that the "Collateral Assignment" creates a mechanism of perfection in lieu of a receivership or foreclosure is appropriate. It does no more than recognize the intent of the parties and is clearly within the majority rule concerning interpretation of such contracts—*i.e.*, that the intent of the parties should control. *See, e.g., Taylor*, 621 S.W.2d at 594; *Kinnison v. Guaranty Liquidating Corp.*, 115 P.2d at 453. To pursue the use of Article 9 by analogy, this device does no more than grant the creditor/mortgage a device similar to the "self-help" provision found at Article 9, § 9–503.

■ Various results flow from this analysis. First, as to any rent due and owing or collected from the date of the petition forward, § 363 of the Bankruptcy Code applies. There is no gap between the petition and perfection of a claim in rents as is possible under the facts of *Casbeer* and *Village Properties* (both cases require some post-petition perfection step). *See In re Casbeer*, 793 F.2d at 1442, 1443; *In re Village Properties Inc.*, 723 F.2d at 446. Rents collected by the creditor/mortgagee pre-petition and applied to the debt are also lost to the estate. These are clearly no longer assets of the estate, for they are no longer property of the estate. Rents collected and held by the creditor, however, remain cash collateral—the debt not having been reduced—and are cash collateral in the possession of the creditor. By analogy once again to Article 9, the creditor would have a "possessory security interest." *See* Article 9 § 9–203(1)(a). Rents collected by the debtor/mortgagor are also cash collateral—perfection in the rents dating from notice of license revocation. The rents collected and held by either party should be treated as if a receiver had been appointed and had those rents in its possession on the date of the petition for the period beginning the date of revocation of the license.

A mortgagor which collects rents would be under a duty to account for such rents. *See* 11 U.S.C. § 542. It might be subject to a turnover order for rents held but not applied, presuming adequate protection can be offered under 11 U.S.C. § 363.

As an aside, application of the rents to the debt by the creditor/mortgagee would, by analogy, be appropriate under Article 9, § 9–504, where no notice, etc., of the liquidation of collateral having a fixed, objective value is necessary. Where cash collateral is collected and applied to debt, no notice, etc., is necessary in order to protect the debtor.

■ One troublesome area remains. If the debtor/mortgagor collects rents after the license is revoked but pre-petition and does not hold those rents, but rather applies the rents for other purposes, there is a clear breach of the contract and a clear duty to account. However, such a breach

---

**6.** It is interesting to note that several of the leading cases in this area deal with disputes between the creditor/mortgagee and third parties. *See e.g., Provident Mut. Life Ins. Co. v. Winslow Center Assoc's (In re Winslow Center Assoc's)*, 50 B.R. 679 (Bankr.E.D.Pa.1985) (creditor's committee); *Bevins v. Peoples Bank & Trust Co.*, 671 P.2d 875, 876–77 (Alaska 1983) (another mortgagee); *Kinnison v. Guaranty Liquidating Corp.*, 18 Cal.2d 256, 115 P.2d 450, 454 (1941) (attaching creditor).

might be cured in a plan. *See* 11 U.S.C. § 1124(2). The mere misapplication would not, however, violate § 363, since a case under the Bankruptcy Code has not yet been commenced by a petition. Therefore, such misapplication would be no more than a breach of contract.

## CONCLUSION

While assignment of rent contracts cannot generally divest the debtor of any interest in rents following the execution of such a document, those contracts can be given effect to protect the legitimate interests of creditors in the rents as collateral. This opinion attempts to recognize those interests as well as the right of the Debtor to use cash collateral when appropriate.